# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MIDCAP FUNDING X TRUST, a Delaware statutory trust; ARNOLDO N. CAVAZOS, JR., as duly appointed Receiver for GVLH,[1]

        Plaintiffs,

        v.

GRAEBEL COMPANIES, INC., a Delaware corporation; GRAEBEL SHARED SERVICES, INC., a Delaware corporation; GRAEBEL RISK SERVICES, INC., a Delaware corporation; GRAEBEL/NEW ORLEANS MOVERS, LLC, a Wisconsin limited liability company, as a nominal defendant; and GRAEBEL/UTAH MOVERS, LLC, a Utah limited liability company, as a nominal defendant,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2018-0312-MTZ

## MEMORANDUM OPINION

Date Submitted: January 23, 2020
Date Decided: April 30, 2020

---

[1] "GVLH" collectively means Graebel Vanlines Holdings, LLC; Graebel/Atlanta Movers, LLC; Graebel/Austin Movers, LLC; Graebel/Cincinnati Movers, LLC; Graebel/Colorado Springs Movers, LLC; Graebel/Connecticut Movers, LLC; Graebel/Dallas Movers, LLC; Graebel/Denver Movers, LLC; Graebel/Eastern Acquisition Movers, LLC; Graebel/Erickson Movers, LLC; Graebel Forwarders, LLC; Graebel/Houston Movers, LLC; Graebel/Illinois Movers, LLC; Graebel/Kansas City Movers, LLC; Graebel/Lightning Movers, LLC; Graebel/Los Angeles Movers, LLC; Graebel/Mid-Atlantic Movers, LLC; Graebel/Minnesota Movers, LLC; Graebel Moving & Warehouse, LLC; Graebel Moving and Storage, LLC; Graebel/Nevada Movers, LLC; Graebel/New England Movers, LLC; Graebel/North Carolina Movers, LLC; Graebel/Northeastern Acquisition Movers, LLC; Graebel of Texas, LLC; Graebel/Oklahoma Movers, LLC;

Joseph J. McMahon, Jr., CIARDI CIARDI & ASTIN, Wilmington, Delaware; John A. Harris and Robert P. Harris, QUARLES & BRADY LLP, Phoenix, Arizona, *Attorneys for Plaintiffs*.

Elena C. Norman, Elisabeth S. Bradley, and Kevin P. Rickert, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Kevin E. Wolf, RUDER WARE, Wausau, Wisconsin, *Attorneys for Defendants*.

**ZURN, Vice Chancellor.**

---

GMS Operating, LLC; Graebel/Oregon Movers, LLC; Graebel/Orlando Movers, LLC; Graebel/Pittsburgh Movers, Inc.; GMS Payroll, LLC; Graebel/Quality Movers, LLC; Graebel/San Antonio Movers, LLC; Graebel/South Carolina Movers, LLC; Graebel/South Florida Movers, LLC; Graebel/St. Louis Movers, LLC; Graebel/Tampa Bay Movers, LLC; Graebel/Tennessee Movers, LLC; Graebel Van Lines, LLC; and GVL Fleet Solutions, LLC.

On this motion to dismiss, the Court considers claims regarding a settlement agreement entered into between the insolvent subject company, its securitized creditor, and the defendants. The company provided storage, shipping, and other services to the defendants' end user customers, and the company and the defendants entered into written contracts governing how the defendants paid the company. The company invoiced the defendants for its services provided to the defendants' customers, creating accounts receivable. After an iterative process to approve the invoices, the defendants paid the company, and then billed their end user customers for the company's services and collected from the customers.

This business relationship continued rather seamlessly until early 2017, when the company experienced financial turmoil that ultimately resulted in appointment of a receiver. In March 2017, a dispute arose between the company and defendants over approximately $13 million of accounts receivable. Pressured by a call on the company's debt, the company, creditor, and defendants negotiated to resolve the dispute. During those negotiations, the defendants made two representations: that they had already approved, and billed to and/or collected from their end users, approximately $4 million of the disputed accounts receivable; and that they expected to receive at least $2 million more on outstanding accounts receivable.

By mid-April, the defendants, company, and creditor executed a settlement agreement intended to satisfy the defendants' accounts receivables debt. Its clear

1

terms memorialize the defendants' position that they do not owe the full $13 million. The agreement requires defendants to pay $6 million into escrow to be distributed to the company and creditor at specified intervals. The first representation, regarding the $4 million already approved, billed, and/or collected, was not memorialized. The second representation, regarding the expectation of reaping $2 million on outstanding invoices, was reflected in the settlement agreement by a $2 million prepayment out of escrow, representing additional amounts that defendants ultimately believed they would collect from customers for the accounts receivable. Upon receipt of the first $2 million from the end users, the defendants could then keep those funds. Remaining outstanding accounts receivable would be distributed pursuant to an agreed-to payment formula.

That formula is not based on all $13 million of disputed accounts receivable, but specifically provides that defendants' debt is to be satisfied by an identified subset of the accounts receivable. Explicitly excluded from the defendants' payment obligation are invoices for the accounts receivable that were approved, and billed to and/or collected from, the defendants' end users prior to the effective date. The agreement requires the parties to cooperate regarding a process to verify and reconcile all payments pursuant to the agreement's formula.

After execution, the parties cooperated and defendants began processing and paying invoices according to the formula set forth in the agreement. Eventually, the

company and creditor realized that the defendants were reporting suspiciously low returns. They pressed the defendants for information, but the defendants fell silent. When the defendants eventually spoke, the company and creditor heard their message loud and clear: prior to executing the agreement, the defendants actually approved and billed to and or/collected $6 million of the accounts receivable, rather than $4 million as they represented in negotiations.

Thereafter, the parties' relationship soured, and the creditor and the company's receiver filed this suit, asserting breach of contract, breach of the implied covenant, fraud, misrepresentation, mistake, and unjust enrichment claims, and seeking specific performance and reformation. To support their strained contractual theory, the plaintiffs contend that the defendants never informed them during negotiations that the agreement would not process and pay on all $13 million accounts receivable, and that the defendants misrepresented the $6 million collection as $4 million. The plaintiffs primarily press that defendants are obligated to remit any and all funds from invoices that defendants had approved and billed to and/or collected from end users before executing the agreement.

As a practical matter, this action centers on the defendants' alleged misrepresentations (and omissions, as cast by the plaintiffs). The plaintiffs contend that they never would have executed the agreement if they had known of the defendants' $6 million pre-execution payday, and if they had known that the

3

agreement would satisfy the debt with only a subset of the accounts receivable. But the plaintiffs agreed to robust anti-reliance and integration provisions, which preclude any claim based on the $4 million representation or on the defendants' silence. As a legal matter, the misrepresentations are peripheral to this action because they are irrelevant under the agreement's terms.

Accordingly, the plaintiffs pursue this action in the face of the unambiguous agreement, scouring and stretching its terms in an effort to bring the defendants' misrepresentations within its four corners. Plaintiffs' efforts fall short. The agreement does not memorialize or reference the representations regarding accounts receivable that the defendants billed and collected before executing the settlement. It does not contain a single representation or warranty, and its recitals are scant, reflecting only that the parties disputed the total sum of accounts receivable the defendants were obligated to pay.

Because the plaintiffs failed to secure such contractual protections, they regretfully reflect upon the deal the company agreed to and ask this Court to fashion a remedy when they agreed that none would be afforded to them. Accepting the plaintiffs' allegations as true, their retrospective angst is understandable. But the plain language of the agreement governs. As this Court has stated repeatedly: parties have a right to enter into good and bad contracts, and the law enforces both. For the following reasons, the motion to dismiss is granted in part and denied in part.

## I.   BACKGROUND

On April 19, 2017, defendant Graebel Companies, Inc. and fourteen of its affiliates (collectively, "GCI," "Broker," or the "Broker Parties"), including defendants Graebel Shared Services, Inc. and Graebel Risk Services, Inc., entered into a settlement agreement (the "Settlement Agreement") with Graebel Vanlines Holdings, LLC and forty-one of its affiliates (collectively, "GVLH," "Servicer," or the "Servicer Parties"), as well as Servicer's creditor, plaintiff MidCap Funding X Trust ("Midcap" or "Creditor").[2]  The Settlement Agreement resolved all outstanding disputes between the parties, including a dispute related to approximately $13 million in accounts receivable owing from Broker to Servicer.[3]

In this action, Creditor and Arnaldo N. Cavazos, Jr., as duly appointed Receiver for Servicer[4] (the "Receiver," and together with Creditor, "Plaintiffs"), bring nine claims related to the Settlement Agreement against defendants Graebel Companies, Inc., Graebel Shared Services, Inc., Graebel Risk Services, Inc., and nominal defendants Graebel/New Orleans Movers, LLC and Graebel/Utah Movers, LLC (collectively, "Defendants").[5]  On Defendants' motion to dismiss, I draw the

---

[2] *See* Docket Item ("D.I.") 34, Ex. A [hereinafter "Settlement Agreement"].

[3] *Id.* RECITALS C–E.

[4] Cavazos is the receiver appointed for all of the Servicer Parties with the exception of nominal defendants Graebel/New Orleans Movers, LLC and Graebel/Utah Movers, LLC.

[5] *See generally* D.I. 34 [hereinafter "FAC"].

following facts from Plaintiff's Fourth Amended Complaint and the documents integral to it.[6]

## A. Servicer Provides Services To Broker's End User Customers.

Broker arranges moving, storage, and related logistical services for its customers in the United States and other countries. Servicer provides moving and storage services to residential and commercial customers in the United States. Broker contracted with Servicer to provide services to Broker's customers. The written agreements memorializing this business relationship specified the terms under which Servicer assisted Broker's customers and Broker paid Servicer.

Servicer invoiced Broker, thereby creating accounts receivable owing from Broker to Servicer in the invoiced amounts. After receiving an invoice from Servicer, Broker conducted an internal "audit" of the invoice to determine whether Broker agreed that the invoice was in the proper amount and whether the invoice satisfied the billing and other requirements of the parties' contracts. Broker either rejected or approved the invoice. If Broker rejected an invoice, Servicer could correct it and resubmit it.[7] Once Broker approved the invoice, Broker included

---

[6] *See generally id.* On this Motion, I consider the Settlement Agreement and two emails attached as exhibits to the FAC because they are incorporated into and integral to it. *See Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014).

[7] *See* Settlement Agreement § 6.

charges for Servicer's work in invoices that Broker billed to its end user customers. Broker then collected the funds from its customers.

Broker was obligated to pay Servicer for approved invoices regardless of whether Broker billed the invoice to or collected funds from its customers. Broker's payment of accounts receivable to Servicer was separate from Broker's billing and collection from its end user customers. At all times, Broker was in sole possession of information regarding (1) whether and when it internally approved a Servicer invoice, (2) when and in what amounts Broker billed its end user customers for Servicer's work, (3) when and in what amounts Broker collected payment from its end user customers for Servicer's work, and (4) what Broker collected from its customers, how those collections were applied to specific approved Servicer invoices, and whether Broker billed and collected amounts from its customers for Servicer work for which Broker did not actually pay the corresponding Servicer invoices.

**B.    Servicer Struggles Financially And Cannot Pay Creditor, As Broker And Servicer Dispute $13 Million In Accounts Receivable.**

Beginning in March 2017, Servicer experienced business and financial problems that led it to wind down and cease operations. As its problems worsened, Servicer could not pay Creditor. Servicer entered into a loan agreement with Creditor and obtained a revolving credit facility up to a maximum principal amount

of $60 million. As security, Creditor holds a valid and perfected first priority security interest in collateral that includes all accounts receivable owing from Broker to Servicer. Ultimately, in May 2017, Servicer was placed into receivership in Texas. The Receiver was appointed over most of Servicer's assets, including the accounts receivable securing Creditor's loan, and was given express authority to recover and liquidate the accounts receivable, among other Servicer assets.

In March 2017, prior to entering receivership, disputes arose between Servicer and Broker regarding, among other things, the accounts receivable. Servicer asserted that Broker owed it more than $13 million in accounts receivable (the "Accounts Receivable"). Broker represented that the Accounts Receivable as invoiced were at least approximately $13 million,[8] but disputed that it was obligated to pay the full amount of Servicer's invoices.[9] By the end of March, Broker contended it was excused from paying the full amount because (1) certain invoices submitted to Broker for the Accounts Receivable did not comply with the invoicing or other requirements of the parties' contracts; (2) Broker allegedly held claims against Servicer of approximately $2,500,000 that it was entitled to offset against

---

[8] *See* FAC ¶ 33. Broker prepared an "analysis on the open GVL statement of accounts" that it sent to Servicer on March 28, 2017. *See* FAC, Ex. B. It represented that the amount of unpaid Subject Accounts Receivable for which Broker had received invoices through March 28, 2017 was approximately $13.25 million, after application of payments made by Broker to Servicer through March 24, 2017. *Id.*

[9] *See* FAC ¶ 35; Settlement Agreement, RECITAL D.

the Accounts Receivable; and (3) some amounts had not yet been invoiced to Broker, or the invoices remained subject to the internal Broker approval process. Servicer disputed Broker's assertions. As a result of this dispute, Servicer refused to release items that the Broker Parties had stored at Servicer facilities.[10]

### C. Broker, Servicer, And Creditor Negotiate To Settle The Accounts Receivable Dispute.

Because Creditor holds a security interest in the Accounts Receivable and proceeds therefrom, any settlement required Creditor's consent. Accordingly, Creditor participated in settling the dispute between Broker and Servicer. Broker, Servicer, and Creditor began negotiations in early April 2017. The negotiations lasted until April 19 and were conducted through phone conferences, written email, and other communications. Broker's representatives included Brad Siler, Ron Dunlap, and Bill Graebel. Servicer was represented by Craig Boucher, and Creditor was represented by Morrie Aaron.

Throughout negotiations, Broker continued to acknowledge that the Accounts Receivable totaled approximately $13.25 million.[11] Broker did not assert that it intended to exclude from negotiations or the resulting Settlement Agreement any of

---

[10] *See* Settlement Agreement § 3.

[11] FAC ¶ 33, 40; *see also* FAC, Ex. B (analysis sent from Brad Siler to Craig Boucher). The negotiating parties used a summary schedule of the unpaid Accounts Receivable, which showed the total amount to be $13,683,332 as of March 28. *See* FAC ¶ 41; FAC, Ex. C.

the Accounts Receivable or any resulting collections from its end user customers. And Broker remained in sole possession and control over its records regarding internal audit and approval of the invoices comprising the Accounts Receivable, billing and collection from Broker's end user customers, and collections that were applied against the Accounts Receivable. Consequently, Servicer and Creditor's knowledge of those topics was limited to what Broker shared during negotiations.

During those negotiations, Broker consistently represented that it had already approved and billed to and/or collected from its end users approximately $4 million of the Accounts Receivable (the "Billed Invoices"). For example, Dunlap made this representation to Boucher in an email dated April 9, 2017, and Broker's representatives made this representation to Boucher, Aaron, and others in a conference call on April 11.[12] Broker represented that all Accounts Receivable invoices other than the Billed Invoices (1) had been submitted to Broker but had been rejected and returned to Servicer, (2) were still being audited by Broker, (3) had been audited and approved by Broker, but had not yet been billed to Broker's end user customers, or (4) had not yet been submitted to Broker by Servicer. From these four categories, Broker further represented to Servicer and Creditor that Broker believed it would ultimately approve and collect from its end user customers at least $2 million (the "Anticipated Collection")—in addition to the $4 million Billed

---

[12] See FAC ¶ 46. The referenced email was not provided as an exhibit to the FAC.

Invoices. Broker never stated or suggested that the Billed Invoices exceeded $4 million.

As negotiations progressed, the proposed terms of any settlement agreement were based on Broker's representations about the Accounts Receivable.[13] The parties proposed that Broker would pay $4 million into escrow, representing the $4 million Billed Invoices. Broker would also pay into escrow an additional $2 million which would be released immediately to Servicer as a "prepayment" on the Anticipated Collection.[14] On April 9, Dunlap confirmed this structure in an email to Boucher:

> You and I have come to an understanding where there is a 6m payment based on three areas; what is ready to be paid (approx. 2m), a prepayment of 2m towards receivables we believe may be collectible, and the agreement that we "write-off" approximately 2m in AR that we have with GVL for TSA charges, Orlando rent payments, work completed at the request of GVL, etc.[15]

---

[13] *See* FAC ¶ 50 (stating that the proposed terms were based on "(a) that the entire amount of the outstanding Subject Accounts Receivable totaling approximately $13.6 million were included in, and addressed under the provisions of, the Settlement Agreement; (b) that [Broker] had approved and billed to, and/or collected from, its end user customers on account of the Subject Accounts Receivable no more than approximately $4 million; (c) that other than the approximately $4 million already billed to and/or collected from its end user customers, all other invoices for Subject Accounts Receivable in possession of [Broker] were either undergoing audit or had not yet been billed to [Broker's] end user customers[;] and (d) that [Broker] believed it would ultimately approve and collect from its end user customers at least an additional $2 million on account of the Subject Accounts Receivable").

[14] *See id.* ¶ 51.

[15] *Id.* ¶ 55. This email was not provided as an exhibit to the FAC.

11

Because Broker was "prepaying" an additional $2 million on account of the Anticipated Collection, in the proposed settlement payment structure, Broker would keep the first $2 million collected from Broker customers. The parties would share further collections until Broker had received an additional $2.5 million, to account for its setoffs, and Servicer and Creditor would then receive 100% of any remaining collections from Broker customers with respect to Accounts Receivable. They also proposed that Broker would cooperate in good faith to process all other categories of invoices for the Accounts Receivable beyond the approximately $4 million Billed Invoices.

On April 17, in response to the penultimate draft of the Settlement Agreement, Dunlap of Broker stated in an email to Creditor that, while Broker had not yet formally approved the latest form of the agreement, Broker's business and legal personnel were meeting to give "the final approval, but it should be a rubber stamp."[16] Broker stated that any changes were intended to make the agreement's terms consistent with the existing structure. Broker never stated, and none of the drafts explicitly provided, that Billed Invoices would be excluded from the agreement's provisions for processing the Accounts Receivable. More generally, Broker never indicated that any revisions were intended to exclude any category of

---

[16] *Id.* ¶ 58.

Accounts Receivable, including those based on when Broker may have approved and billed to and/or collected from its end user customers. Servicer and Creditor agreed to settle the Accounts Receivable dispute based on the proposed terms and Broker's representations during negotiations.

### D. Broker, Servicer, And Creditor Execute The Settlement Agreement.

On April 19, 2017 (the "Effective Date"), Broker, Servicer, and Creditor finalized and executed the Settlement Agreement, intending for it "to, among other things, resolve disputes regarding the Accounts Receivable and to provide for payment and satisfaction of the Accounts Receivable in accordance with the terms of [the] Agreement."[17] The Settlement Agreement's recitals recognize that "there are certain accounts receivable totaling in the aggregate more than $13 million owing from the [Broker] Parties to the [Servicer] Parties,"[18] and that the "[Broker] parties dispute that all of the Accounts Receivable are owing as asserted by the [Servicer] Parties."[19] In providing the terms by which Broker is to satisfy its debt to Servicer, the Settlement Agreement does not state that all $13 million of the Accounts Receivable will be processed thereunder.

---

[17] Settlement Agreement, RECITAL E.

[18] *Id.* RECITAL C.

[19] *Id.* RECITAL D.

13

The Settlement Agreement contains two provisions requiring payments by Broker: Section 2 and Section 6.[20] Section 2 requires that Broker immediately pay $6 million into escrow for the benefit of Servicer and Creditor (the "Escrow Payment").[21] The first $2 million of the Escrow Payment is to be immediately released to Servicer and Creditor.[22] The remaining Escrow Payment is to be released at set intervals, tethered to the Settlement Agreement's mandate that Servicer release to Broker the items being held at Servicer's storage facilities.[23] Any remaining funds from Escrow Payment would be distributed no later than June 1, 2017.[24] Section 2 does not otherwise categorize or allocate the Escrow Payment, and makes no mention of the $4 million Billed Invoices.[25] Nor does it specify that any of the Escrow Payment is considered "prepayment."[26]

Section 6 memorializes Broker and Servicer's agreement to "process invoices relating to the Accounts Receivable which may be or become outstanding between

---

[20] *See generally id.* §§ 2, 6.

[21] *Id.* § 2.

[22] *Id.* § 2.1. The immediate $2 million payment is specifically "in addition to all payments made by the [Broker] Parties to the [Servicer] Parties prior to the date of [the] Agreement." *Id.*

[23] *Id.* §§ 2.2, 2.3, 2.4, 3. The first deferred payment occurs once 50% of the storage items have been released, the second when 75% of the storage items have been released, the third when 95% of the storage items have been released.

[24] *Id.* § 2.5.

[25] *See id.* § 2.

[26] *See id.*

the [Broker] Parties and the [Servicer] Parties in accordance with" its terms.[27] Section 6 does not include Billed Invoices, specifically those billed prior to the Effective Date.[28] Rather, Section 6 identifies specific categories of invoices to be processed and paid to Servicer, explicitly limited to post-Effective Date invoices and funds. Invoices processed under Section 6 include:

---

[27] *Id.* § 6.

[28] *See id.*

- "Prior Audited and Approved Invoices," which are those that, "*[a]s of the Effective Date*," Servicer has submitted to Broker and Broker has audited and approved, but have not yet been billed to Broker's customers;[29]

- "Prior Unaudited Invoices," which are those that, "*[a]s of the Effective Date*," Servicer has submitted to Broker and are in the process of being audited;[30]

- "Unbilled and Resubmitted Invoices," which new invoices or resubmitted versions of previously rejected invoices that Servicer will continue to submit to Broker "*[o]n and after the Effective Date*;"[31] and

- "Approved Invoices," which are those Prior Unaudited Invoices and Unbilled and Resubmitted Invoices that, "*[o]n and after the Effective Date*," Broker continues to review and ultimately approve pursuant the parties' underlying contract terms.[32]

Section 6 further provides that "[o]n and after the Effective Date," Broker would bill its customers for all Approved Invoices and all Prior Audited and Approved Invoices, "subject to such exceptions thereto as may be acceptable to the [Broker] Parties in their sole discretion."[33] These are referred to as the "Submitted Invoices."[34]

---

[29] *Id.* § 6.2 (emphasis added).

[30] *Id.* § 6.1 (emphasis added).

[31] *Id.* § 6.3 (emphasis added).

[32] *Id.* § 6.4 (emphasis added).

[33] *Id.* § 6.5. The Settlement Agreement explicitly states that Broker is not responsible to Servicer for any Unbilled and Resubmitted Invoices or Prior Unaudited Invoices that were not approved by Broker. *Id.*

[34] *Id.*

The payment waterfall set forth in Section 6.6 allocates certain customer collections among Broker, Servicer, and Creditor. Those allocated funds are collected from the Submitted Invoices, as well as from any other Prior Unaudited Invoices or Unbilled and Resubmitted Invoices that Broker bills to customers on or after the Effective Date (the "Future Customer Collections").[35] Under the waterfall, Broker retains the first $2 million in Future Customer Collections to "address[]" "prepaid accounts receivable,"[36] which Servicer alleges references the $2 million released through the Escrow Payment.[37] Broker and Servicer split additional Future Customer Collections received thereafter until Broker has been reimbursed for certain costs and expenses approximating $2.5 million.[38] The remaining Future Customer Collections are then paid in full to Creditor "on [Servicer]'s behalf."[39]

Finally, Section 6.7 requires Broker and Servicer "to fully cooperate with one another regarding a process for the parties to verify and reconcile with respect to the [Future Customer Collections], payments, and other matters addressed in [] Section 6."[40] The obligation under Section 6.7 burdens both Broker and Servicer, permitting

---

[35] *Id.* § 6.6.

[36] *Id.* § 6.6.2.

[37] *Id.* §§ 6.6.1, 6.6.2.

[38] *Id.* § 6.6.2.

[39] *Id.* § 6.6.3.

[40] *Id.* § 6.7.

each party to request the cooperation of the other regarding their own process to verify and reconcile payments under Section 6.[41] And Section 13.7 requires that the parties "do all such acts and cause to be done all such things as the other parties reasonably may request in order to give full effect to this Agreement."[42]

Section 9 recognizes that Broker's payments under Sections 2 and 6 of the Settlement Agreement "are in payment and satisfaction of the Accounts Receivable," and that "[a]ll payments made by the [Broker] Parties under [the] Agreement constitute payments on account of, and are proceeds of, the Accounts Receivable."[43] Section 9 explicitly states,

> The obligations of the [Broker] Parties with respect to the Accounts Receivable shall be governed in all respects by the terms of this Agreement, and the [Broker] Parties' liability with respect to the Accounts Receivable, as settled pursuant to this Agreement, shall be limited to their obligations under the Agreement.[44]

The Settlement Agreement contains additional provisions making clear that it fully supplants any oral or written representation or agreement that existed prior to the Effective Date. Section 12 includes an anti-reliance provision:

---

[41] *Id.*

[42] *Id.* § 13.7.

[43] *Id.* § 9.

[44] *Id.*

Each and every one of the parties hereto expressly agrees and acknowledges that it has been represented by counsel in connection with the negotiation and execution of this Agreement. Each and every one of the parties hereto further expressly agrees and acknowledges that it is not entering into this Agreement in reliance upon any representations, promises or assurance other than those expressly set forth in this Agreement.[45]

The parties also agreed to Section 13.8's integration clause:

This Agreement supersedes any prior contracts, understandings, discussions, and agreements among the parties hereto and constitutes the complete understanding among them with respect to the subject matter hereof.[46]

### E. Broker Refuses To Cooperate With Servicer And Creditor, And The Parties' Relationship Sours.

After the Effective Date, Servicer resubmitted previously rejected invoices, and submitted any remaining and previously unsubmitted invoices, for processing by Broker. And for several months, representatives of Broker, Servicer, and Creditor regularly communicated regarding processing the Accounts Receivable and allocating collections under the Settlement Agreement.

But eventually, Broker stopped cooperating with Servicer. Servicer repeatedly requested that Broker cooperate to verify and reconcile the Future Customer Collections in accordance with Section 6.7, and requested information from Broker in order to verify and reconcile their records. Broker refused to provide

---

[45] *Id.* § 12.

[46] *Id.* § 13.8.

the requested information regarding which specific Servicer invoices had been approved, when such approvals were made, when Broker billed its end user customers for specific Servicer invoices, when Broker's end user customers paid Broker for Servicer invoices, when and how Broker applied collections from its end user customers to specific Servicer invoices comprising the Accounts Receivable, and whether Broker was billing and collecting from its end user customers amounts for Servicer invoices that Broker did not approve or pay to Servicer.

From and after June 2017, Broker reported to Servicer and Creditor collected amounts that were materially lower than Servicer and Creditor expected given the amounts invoiced for the Accounts Receivable. Servicer and Creditor recognized the discrepancy and again requested that Broker cooperate with a meaningful verification and reconciliation of the Accounts Receivable processed under the Settlement Agreement. Broker ignored these requests, and the relationship between the parties continued to deteriorate.

Months after the parties executed the Settlement Agreement, Broker revealed that the Billed Invoices before the Effective Date totaled more than $6 million, rather than $4 million as Broker had represented during negotiations. Broker shared its belief that it was entitled to retain the excess pre-Effective Date collections, as they were excluded from the Settlement Agreement. Drawing all reasonable inferences from the FAC's allegations, this meant either (1) the same Billed Invoices reaped

20

more collections from end users than expected, or (2) more of the $13 million in invoices were included in the Billed Invoices than represented, diminishing the portion of the disputed $13 million processed under Section 6 by $2 million. In response, Servicer and Creditor again requested Broker's information and cooperation, and Broker refused.

In December 2017, Creditor made oral and written demands on Broker to remit the full amounts due under the Settlement Agreement. Based on the total invoices comprising the Accounts Receivable, Servicer and Creditor asserted that Broker is obligated to pay at least $1,494,870 for pre-Effective Date Billed Invoices, as well as additional Future Customer Collections processed under Section 6 of the Settlement Agreement. Broker refused the demands.

### F. Creditor Brings This Action.

Creditor commenced this action on April 27, 2018 without naming Servicer as a party.[47] On May 22, Defendants moved to dismiss.[48] In response, Creditor filed its First Amended Complaint on August 22.[49] The next day, Creditor sought leave to file its Second Amended Complaint to add Cavazos as a plaintiff in his capacity

---

[47] D.I. 1.

[48] D.I. 7, 12.

[49] D.I. 14.

as Servicer's Receiver.[50]  Defendants stipulated to an order to allow the filing, which the Court entered on August 30.[51]

On September 10, Plaintiffs filed the Second Amended Complaint, and subsequently Defendants moved to dismiss.[52]  Thereafter, Defendants stipulated to an order allowing Plaintiffs to file a Third Amended Complaint after Plaintiffs had inadvertently failed to name a number of necessary parties.[53]  The Court entered that order on December 20,[54] and on January 2, 2019, Plaintiffs filed the Third Amended Complaint.[55]  Again, Defendants moved to dismiss.[56]

On May 10, with Defendants' consent pursuant to Court of Chancery Rule 15(a), Plaintiffs filed the Fourth Amended Complaint, which is the operative pleading (the "FAC").[57]  The FAC asserts nine counts.  Count IV asserts a breach of contract claim for failure to properly allocate and remit all collections from the post-Effective Date Accounts Receivable processed under Section 6.  I refer to this as the "Post-Effective Date Claim."  Count I asserts a breach of contract claim for failure

---

[50] D.I. 16.

[51] D.I. 17, 18.

[52] D.I. 20, 21.

[53] D.I. 26.

[54] D.I. 27.

[55] D.I. 28.

[56] D.I. 29, 32.

[57] D.I. 34.

to pay the Servicer Parties on pre-Effective Date Billed Invoices pursuant to Section 6 of the Settlement Agreement. Also tethered to Broker's retention of funds from pre-Effective Date Billed Invoices, Count V asserts a claim for breach of the implied covenant of good faith and fair dealing, and Count IX asserts an unjust enrichment claim. Counts VI and VII assert misrepresentation and fraudulent concealment, and Count VIII alleges mistake and seeks reformation. I refer to Counts I, V, VI, VII, VIII, and IX as the "Pre-Effective Date Claims." Finally, Count II asserts a breach of contract claim for Broker's failure to cooperate under Sections 6.7 and 13.7 of the Settlement Agreement, and Count III seeks specific performance under those Sections. I refer to Counts II and III as the "Cooperation Claims."

Defendants moved to dismiss the FAC on May 22 (the "Motion").[58] The parties fully briefed the Motion as of December 6,[59] and I heard oral argument on January 23, 2020.[60]

## II. ANALYSIS

Defendants have moved to dismiss pursuant to Court of Chancery Rule 12(b)(6). The standard for dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established.[61] In considering this

---

[58] D.I. 37.

[59] D.I. 40, 48, 52.

[60] D.I. 63.

[61] *See Feldman v. Cutaia*, 2006 WL 920420, at *7 (Del. Ch. Apr. 5, 2006).

23

Motion, I must accept as true all well pleaded facts and inferences that can reasonably be drawn therefrom. "[D]ismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[62] A motion to dismiss will be granted only if "it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading."[63] That determination is generally limited to the factual allegations contained in the complaint and documents integral thereto.[64]

With respect to Plaintiffs' fraud, misrepresentation, and mistake claims, Defendants have also moved to dismiss for failure to plead each claim with the requisite particularity under Court of Chancery Rule 9(b). Those claims are subject to Rule 9(b)'s more stringent standard that requires plaintiffs to state "with particularity" the "circumstances constituting fraud or mistake."[65] "The factual circumstances that must be stated with particularity refer to the time, place, and contents of the false representations; the facts misrepresented; the identity of the

---

[62] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 897 (Del. 2002) (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982)).

[63] *Feldman*, 2006 WL 920420, at *7.

[64] *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2; *Feldman*, 2006 WL 920420, at *7.

[65] Ct. Ch. R. 9(b); *see PR Acqs., LLC v. Midland Funding LLC*, 2018 WL 2041521, at *13 (Del. Ch. Apr. 30, 2018) ("A negligent misrepresentation claim must be stated with the same particularly required for fraud.").

person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation."[66]

Plaintiffs' overarching theory is that Servicer and Creditor never would have executed a Settlement Agreement entitling Broker to the first $2 million under Section 6.6, representing Anticipated Collections, if they had known that collections from pre-Effective Date Billed Invoices exceeded the represented $4 million by another $2 million. They argue that Broker received the $2 million in Anticipated Collections (reflected in the prepayment) already, as excess and hidden Billed Invoices. Plaintiffs conclude that Broker should not be permitted to keep the $2 million prepayment.

In a moonshot, Plaintiffs seek payment for all Accounts Receivable, including pre-Effective Date Billed Invoices. At a minimum, Plaintiffs ask that this Court require Defendants to comply with the express terms of the Settlement Agreement. Reading the FAC and drawing all inferences in favor of Plaintiffs, only the Post-Effective Date claim for breach of contract (Count IV) and Cooperation Claims (Counts II and III) survive the Motion. All Pre-Effective Date Claims must be dismissed for failure to state a claim.

---

[66] *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 207–08 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007) (TABLE).

**A.  The Settlement Agreement's Plain Language Provides That Post-Effective Date Invoices Processed And Paid Under Section 6 Are In Full Satisfaction of The Accounts Receivable, And Excludes All Pre-Effective Date Invoices.**

Plaintiffs allege that Defendants have breached the Settlement Agreement by two failures to pay.  First, regarding post-Effective Date invoices and collections, Plaintiffs contend that Defendants breached Section 6 by "failing to remit and pay to Plaintiffs their full share of [Future Customer Collections] received by [Broker] on or after the April 19, 2017 effective date."[67]  Second, regarding pre-Effective Date Billed Invoices, Plaintiffs assert "that the Settlement Agreement when read in full precludes [Broker] from attempting to exclude from the ambit of Section 6 any Subject Accounts Receivable which [Broker] says it had billed to and/or collected from [Broker] Customers prior to the Effective Date of the Settlement Agreement."[68]

Under Delaware law, "[i]n order to allege a breach of contract, a plaintiff must show the existence of a contract, a breach of the contractual obligations, and damages to the plaintiff as a result of the breach."[69]  I look first to the language of the Settlement Agreement to determine whether Plaintiffs have stated a claim for relief.

---

[67] FAC ¶ 134 (internal quotation marks omitted).

[68] D.I. 48 at 59; *see* FAC ¶¶ 99–105.

[69] *Sparton Corp. v. O'Neil*, 2017 WL 3421076, at *5 (Del. Ch. Aug. 9, 2017).

The principles governing contract interpretation are well settled. Contracts must be construed as a whole, to give effect to the intentions of the parties. Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning. Courts consider extrinsic evidence to interpret the agreement only if there is an ambiguity in the contract.[70]

Contract language is ambiguous if it is "reasonably susceptible of two or more interpretations or may have two or more different meanings."[71]

"When interpreting a contract, a court must give effect to all of the terms of the instrument and read it in a way that, if possible, reconciles all of its provisions."[72] "[A] court will prefer an interpretation that harmonizes the provisions in a contract as opposed to one that creates an inconsistency or surplusage."[73] "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[74]

Consistent with Delaware's pro-contractarian policy, "a party may not come to court to enforce a contractual right that it did not obtain for itself at the negotiating

---

[70] *Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) (citations omitted).

[71] *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003) (quoting *Kaiser Alum. Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996)); *see also GMG Capital Invs., LLC v. Athenian Venture Pr's I, L.P.*, 36 A.3d 776, 781–82 (Del. 2012).

[72] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *4 (Del. Ch. June 21, 2012).

[73] *Id.*

[74] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

27

table."[75]  Delaware law presumes parties are bound by the language of the agreement they negotiated, especially when the parties are sophisticated entities that have engaged in arms-length negotiations.[76]  With these principles in mind, I look to the plain language of the Settlement Agreement to determine whether the Plaintiffs have stated a breach of contract claim with respect to the pre- and post-Effective Date invoices for the Accounts Receivable.  I turn first to the Post-Effective Date Claim, and then the Pre-Effective Date Claims.

> ### a. Plaintiffs Have Stated A Claim For Failure To Remit Funds From Post-Effective Date Invoices Under Count IV.

Plaintiffs allege that Defendants have breached Section 6.6 by failing to remit the full amounts from post-Effective Date Future Customer Collections to which Plaintiffs are entitled under the waterfall.  This claim is premised on Plaintiffs' allotted portion of Future Customer Collections, which include all funds that Broker collected from its customers under Section 6's categories of post-Effective Date invoices.[77]  Reading the FAC in the light most favorable to Plaintiffs, Plaintiffs have stated a claim for breach of contract under Count IV.

---

[75] *GRT, Inc.*, 2012 WL 2356489, at *7.

[76] *See HC Cos., Inc. v. Myers Indus., Inc.*, 2017 WL 6016573, at *5 (Del. Ch. Dec. 5, 2017).

[77] Settlement Agreement § 6.6.

Under the Settlement Agreement, Broker retains the first $2 million of Future Customer Collections. But Broker must split additional Future Customer Collections amassed thereafter with Servicer until Broker has been reimbursed for certain setoffs approximating $2.5 million.[78] Then, additional Future Customer Collections are to be paid in full to Creditor "on [Servicer's] behalf."[79]

From and after June 2017, Broker reported to Servicer and Creditor amounts collected that were materially lower than expected given Servicer's invoices.[80] Broker, in sole possession of information relating to the Future Customer Collections, has not explained the discrepancy. Accepting Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, they have alleged that Defendants withheld more than their allotted share under Section 6.6, breaching their obligations thereunder, and have damaged Plaintiffs as a result. The Motion is denied with respect to Count IV.

> **b.** **Count I Must Be Dismissed Because Pre-Effective Date Invoices Are Excluded From The Settlement Agreement's Plain Language.**

Plaintiffs allege that Section 6 requires Broker to pay amounts from pre-Effective Date Billed Invoices, and that Broker has failed to make those payments

---

[78] *Id.* § 6.6.2.

[79] *Id.* § 6.6.3.

[80] *See* FAC ¶¶ 81–83, 134.

and has therefore breached the Settlement Agreement.[81]  But in the same breath, Plaintiffs recognize that "Section 6 of the Settlement Agreement addressed post-effective date collections and was silent regarding any additional pre-effective date collections of Subject Accounts Receivable . . . ."[82]  To remedy this inconsistency, Plaintiffs float two theories to bring pre-Effective Date Billed Invoices within the scope of Broker's contractual obligations.

1.    **"Outstanding" Invoices Processed Under The Waterfall Have Not Been Billed To Customers As Of The Effective Date.**

Section 6 addresses "Accounts Receivable which may be or become outstanding" as enumerated in a few specific categories.[83]  Plaintiffs agree that those categories do not explicitly include pre-Effective Date Billed Invoices, but strain to

---

[81] As stated, I parse Count IV as a Post-Effective Date Claim, and Count I as a Pre-Effective Date Claim.  Indeed, Plaintiffs distinguishes Counts I and VI, stating that Count IV "is a breach of contract claim based on [Broker]'s failure to pay amounts due under the Settlement Agreement even under the interpretation of the Settlement Agreement urged by [Broker]."  D.I. 48 at 59.  Plaintiff also asserts that Count I "is a breach of contract claim, which asserts that the Settlement Agreement when read in full precludes [Broker] from attempting to exclude from the ambit of Section 6 any Subject Accounts Receivable which [Broker] says it had billed to and/or collected from [Broker] Customers prior to the Effective Date of the Settlement Agreement."  *Id.*  But Count I also alleges that "[Broker] has breached the Settlement Agreement by failing to remit all amounts [Broker] is obligated to remit to [Servicer/Creditor] to date under Section 6 of the Settlement Agreement, including, without limitation, failing to remit the required allocations from funds that [Broker] collected from its customers on or after the April 19, 2017 effective date . . . ."  FAC ¶ 104.  This allegation sounds in post-Effective Date disputes, which are addressed in Count IV above.  I cabin Count I as a Pre-Effective Date Claim.

[82] FAC ¶ 144.

[83] Settlement Agreement § 6.

include them through Section 6's prefatory language.[84]  First, Plaintiffs broadly argue that "outstanding" Accounts Receivable requires all $13 million of Accounts Receivable invoices to be processed under Section 6.  Plaintiffs also look to this language in interpreting Section 6.6's categories to include pre-Effective Date Billed Invoices, where the customer did not pay the Broker until after the Effective Date.  I interpret the preamble, and Section 6.6's categories, differently.  Plaintiffs have not alleged any facts indicating that Defendants had, and therefore breached, any obligation with respect to pre-Effective Date Billed Invoices.[85]

"Under [a] general rule of construction, specific words limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate."[86]  The phrase "Accounts Receivable which may be or become outstanding" must be read in light of the specific language that follows.

After this clause, Section 6 narrows the universe of eligible invoices by identifying specific categories of post-Effective Date invoices that "may be or become outstanding" and therefore be processed under Section 6.6.  Those invoices

---

[84] FAC ¶ 144.

[85] *See Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *8 (Del. Ch. May 7, 2008); *US Ecology, Inc. v. Allstate Power Vac, Inc.*, 2018 WL 3025418, at *7 (Del. Ch. June 18, 2018).

[86] *In re IAC/InterActive Corp.*, 948 A.2d 471, 496 (Del. Ch. 2008) (internal quotation marks omitted) (quoting 11 *Williston on Contracts* § 32:10 (4th ed. 1999)).

are defined by their processing status: new invoices that have yet to be approved,[87] rejected invoices that will be resubmitted for approval,[88] invoices that are being audited,[89] and invoices that have been audited and approved by Broker but not yet billed to customers.[90] Each category shares one common characteristic: as of the Effective Date, the invoices have not yet been billed to Broker customers. An invoice is "outstanding" under Section 6 because it has not been billed to Broker's end users. Accordingly, the parties agreed in Section 6.5 that, on or after the Effective Date, Broker would bill its customers for the identified invoices, making them "Submitted Invoices" to be processed in Section 6.6's payment waterfall.

Because "outstanding" invoices have not been billed, Section 6's general prefatory language does not sweep in pre-Effective Date Billed Invoices. Section 6 excludes pre-Effective Date Billed Invoices from the defined list of invoices to be processed under the payment waterfall. Section 6 does not encompass all $13 million in Accounts Receivable.

Further, Section 6.6 limits payment to invoices billed "on and after the Effective Date."[91] According to Plaintiffs, Section 6.6 "generally provides that all

---

[87] Settlement Agreement § 6.3 ("Unbilled and Resubmitted Invoices").

[88] *Id.* ("Unbilled and Resubmitted Invoices").

[89] *Id.* § 6.1 ("Prior Unaudited Invoices").

[90] *Id.* § 6.2 ("Prior Audited and Approved Invoices").

[91] *Id.* § 6.6.

funds that [Broker] collects from [its] Customers after the Effective Date are to be allocated between [Broker] and the Plaintiffs,"[92] and "the phrase 'on or after the Effective Date' applies only to when collections were received."[93] But whether the end user has paid Broker is irrelevant under Section 6's plain terms. Each invoice processed through Section 6.6's waterfall is defined "[a]s of the Effective Date," or "[o]n and after the Effective Date."[94] Section 6.6 only processes invoices billed after the Effective Date.

The practical effect is this: Section 6.6 does not entitle Servicer and Creditor to funds from pre-Effective Date Billed Invoices, even if Broker was paid on those invoices after the parties executed the Settlement Agreement. Section 6 does not include Billed Invoices predating the Effective Date.[95] Servicer and Creditor could have bargained to include such invoices in the ambit of Section 6, but failed to do so. They cannot now rely on a strained and unreasonable interpretation of the Settlement Agreement to remedy their remorse.

---

[92] D.I. 48 at 61.

[93] *Id.* at 62.

[94] Settlement Agreement §§ 6.1, 6.2, 6.3, 6.4, 6.5.

[95] *See id.* § 6.

### 2. Broker's Excess Pre-Effective Date Collections Do Not Translate To A Forfeiture Of Post-Effective Date Collections.

Second, Plaintiffs seek to access the extra $2 million Broker received on pre-Effective Date Billed Invoices by equating those collections to the post-Effective Date Anticipated Collections. Broker contends the Agreement permits it to keep the extra $2 million from pre-Effective Date Invoices, as well as the first $2 million of post-Effective Date Anticipated Collections under the prepayment language.

Plaintiffs point to Broker's late disclosure that the Billed Invoices actually totaled $6 million, not $4 million, and their alleged pre-execution understanding of the Escrow Payment's component parts.[96] Looking to the $2 million prepayment, Plaintiffs theorize that if Broker keeps the undisclosed $2 million from pre-Effective Date Billed Invoices, Broker is not entitled to the first $2 million of Future Customer Collections under Section 6.6, and that Broker's retention of that first $2 million under Section 6.6 constitutes a breach.

Attempting to ground this theory in the Settlement Agreement's language, Plaintiffs rely on Section 6.6.2's mention of "prepaid accounts receivable (which are

___

[96] As the reader may recall, Plaintiffs allege that the entered into the Settlement Agreement assuming that the $6 million Escrow Payment represented the $4 million pre-Effective Date Billed Invoices, as well as a $2 million prepayment of the Anticipated Collection. *See* FAC ¶ 50.

addressed by the First $2,000,000 of [Future Customer Collections])."[97] This is the Settlement Agreement's only reference to prepayment. The first $2 million of Future Customer Collections derive from the Submitted Invoices, which as discussed are only billed after the Effective Date. Section 2, which sets forth the terms of the Escrow Payment, compels the immediate release of the first $2 million out of escrow to Servicer, but does not specify that it is intended as a prepayment.

Plaintiffs argue that "[a] prepayment concept only makes sense if the specific invoices comprising the Subject Accounts Receivable are processed in the manner Plaintiffs contend is required under Section 6," and that "[Broker]'s interpretation of the Settlement Agreement would render the stated prepayment concept surplusage."[98] After significant consideration, I break down Plaintiffs' theory in the following way.

Defendants represented during negotiations that Broker expected to receive, but had not yet billed to or collected from its end user customers, $2 million in Anticipated Collections. Accordingly, the parties agreed that $2 million of the Escrow Payment would be prepaid to Servicer, and that Broker would keep the first $2 million received from Future Customer Collections from post-Effective Date

---

[97] Settlement Agreement § 6.6.2.

[98] D.I. 48 at 62–63.

invoices. Under the Settlement Agreement, Broker therefore agreed to prepay Servicer the $2 million in Anticipated Collections on post-Effective Date invoices.

But Plaintiffs contend that Broker collected an additional $2 million on pre-Effective Date Billed Invoices. Plaintiffs complain that this $2 million is excluded from the waterfall, and that their shortfall is due to Defendants' misrepresentations in negotiations. Plaintiffs assert that Broker is not entitled to keep the first $2 million under the payment waterfall. They say that because Defendants actually realized their $2 million expectation prior to the Effective Date, as evidenced by Defendants' post-Effective Date disclosure, Defendants never actually "prepaid" anything.[99] According to Plaintiffs, what Defendants received on the front end of the transaction, they may not receive again on the back end.

Plaintiffs' theory depends on their assumption that the prepaid $2 million and the excess, undisclosed $2 million both flow from pre-Effective Date Billed Invoices. The Settlement Agreement's plain terms indicate this is a false equivalency. The prepayment out of escrow, "addressed" by the first $2 million of

---

[99] Plaintiffs' argument benefits from the fact that the prepaid Anticipated Collections and the excess pre-Effective Date collections are the same amount: $2 million. To clarify my analysis, I offer a hypothetical in which Defendants represented that the collection from pre-Effective Date Billed Invoices would total $5 million, but received $6 million. Extending Plaintiffs' logic, Plaintiffs would contend that Defendants (1) only "prepaid" $1 million in the Escrow Payment, (2) accurately predicted they would collect another $1 million post-Effective Date, and (3) are accordingly entitled to keep only the first $1 million under the waterfall.

36

Future Customer Collections, corresponds to collections from post-Effective Date Submitted Invoices under Section 6.[100] The prepayment does not, and by Section 6's terms, cannot, correspond to collections from pre-Effective Date Billed Invoices, and therefore does not account for any funds in excess of the $4 million from pre-Effective Date Billed Invoices.

Accordingly, the $2 million that Broker prepaid Servicer represented Anticipated Collections from post-Effective Date invoices identified in Section 6, and cannot be the source of any alleged contractual breach related to pre-Effective Date invoices. This is consistent with Defendants' representations before execution that $2 million of the Escrow Payment constituted a prepayment by Broker of Anticipated Collections from invoices "it had not yet approved and billed to, and/or collected from, its end user customers."[101] Under the Settlement Agreement's plain terms, the fact that Broker's collections from pre-Effective Date Billed Invoices were higher than represented does not affect Broker's entitlement to the first $2 million of Future Customer Collections under the waterfall, and cannot obligate Broker to remit to Servicer and Creditor funds from pre-Effective Date Billed Invoices.

---

[100] Settlement Agreement § 6.6.2.

[101] FAC ¶ 142.

At bottom, Plaintiffs postulate that Defendants have breached the Settlement Agreement by retaining both the excess $2 million in pre-Effective Date Billed Invoices, as well as the first $2 million they are entitled to under Section 6's waterfall. But nothing in the Settlement Agreement prevents Defendants from doing this. The Settlement Agreement maintains a strict divide between pre- and post-Effective Date invoices. The Settlement Agreement permits Broker to collect, and keep, customer payments for pre-Effective Date Billed Invoices, and permits Broker to keep the first $2 million under Section 6 for post-Effective Date Future Customer Collections (after paying $2 million to Servicer out of escrow). Servicer and Creditor could have negotiated for a kickback in the event Broker's collections from pre-Effective Date Billed Invoices exceeded the represented $4 million, but failed to do so.[102] Count I is dismissed.

---

[102] From the allegations in the FAC, it is reasonably conceivable that after Broker represented it had only collected $4 million in Billed Invoices, Broker hurried to process $2 million in additional invoices to prevent those funds from being processed under Section 6.6. But even if Broker did this to decrease the payment Servicer would receive under the Settlement Agreement, Servicer failed to negotiate to protect itself from this tactic. There was no agreement that Broker would stop processing and collecting on invoices after it had represented it had only collected $4 million during negotiations, and Servicer and Creditor did not secure a representation or warranty that those collections remained at $4 million as of the Effective Date.

**B.** **Plaintiffs' Implied Covenant Claim Must Be Dismissed Because The Parties Consciously Excluded Pre-Effective Date Billed Invoices From The Agreement's Waterfall.**

Plaintiffs assert the Settlement Agreement's specific terms do not expressly reflect the parties' entire bargain because Section 6 is "silent regarding any additional pre-effective date collections of Subject Accounts Receivable."[103] In particular, Plaintiffs claim that Billed Invoices predating the Effective Date constitute an "unstated" category of Accounts Receivable that must be processed under Section 6.[104] Invoking the implied covenant of good faith and fair dealing, Plaintiffs allege that the Settlement Agreement's silence regarding pre-Effective Date Billed Invoices creates a gap that frustrates its overarching purpose.

"The implied covenant of good faith and fair dealing inheres in every contract."[105] It "involves a cautious enterprise, inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party

---

[103] FAC ¶ 141.

[104] D.I. 48 at 40.

[105] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).

anticipated."[106]  The doctrine "cannot be used to circumvent the parties' bargain, or

to create a free-floating duty unattached to the underlying legal documents."[107]

> We will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected.  When conducting this analysis, we must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both.[108]

Determining whether the implied covenant applies turns on the language of the

contract itself.[109]  A claim for breach of the implied covenant cannot be based "on

conduct authorized by the terms of the agreement."[110]  The Court relies on the

implied covenant "only in that narrow band of cases where the contract as a whole

speaks sufficiently to suggest an obligation and point to a result, but does not speak

---

[106] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (internal quotation marks omitted) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 445 (Del. 2005)); *see also Allen v. El Paso Pipeline GP, Co., L.L.C.*, 113 A.3d 167, 182 (Del. Ch. 2014) (referring to the implied covenant as "the doctrine by which Delaware law cautiously supplies terms to fill gaps in the express provisions of a specific agreement").

[107] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1017 (Del. Ch. 2010) (internal quotation marks and citations omitted).

[108] *Nemec*, 991 A.2d at 1126 (footnotes omitted).

[109] *Allen*, 113 A.3d at 183.

[110] *Dunlap*, 878 A.2d at 441; *see also Allen*, 113 A.3d at 183 (stating the covenant cannot be used to "contradict[] a clear exercise of an express contractual right" (quoting *Nemec*, 991 A.2d at 1127)).

directly enough to provide an explicit answer."[111]  "It must be clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter."[112]

Here, the Settlement Agreement does not suffer from any gap that requires the cautious enterprise of inferring terms beyond its clear language.  The Settlement Agreement does not "speak sufficiently to suggest an obligation" with respect to the purported $6 million of invoices that were billed to and/or collected from Broker's end user customers prior to the Effective Date.[113]  To the contrary, as Plaintiffs recognize, the Settlement Agreement specifically calculates the Defendants' obligations based on only post-Effective Date invoices and collections.[114]

Plaintiffs allege that ignoring the pre-Effective Date invoices would frustrate the parties' bargain, but point to no terms in the Settlement Agreement that suggest the parties intended to include them in their bargain.  Rather, Plaintiffs point to the preamble of Section 6, addressing all Accounts Receivable "which may be or

---

[111] *Lonergan*, 5 A.3d at 1018 (quoting *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009)).

[112] *Id.* (omission in original) (quoting *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)).

[113] *Id.* (quotation omitted).

[114] *See* FAC ¶¶ 143–44.

become outstanding between the [Broker] Parties and the [Servicer] Parties,"[115] and broadly conclude that "the structure of the Settlement Agreement was intended to provide for the processing of all Subject Accounts Receivable."[116] Section 6's preamble states as much, but as explained, the preamble addresses "outstanding" invoices—not those that have already been approved and billed. Section 6 is limited only to the specifically identified post-Effective Date invoices to be processed under the Settlement Agreement.[117]

The mere absence of any term regarding the $4 to 6 million in pre-Effective Date Billed Invoices, without more, cannot support an implied covenant claim.[118] According to Plaintiffs, "[h]ad [Broker] disclosed, rather than concealed, that [Broker] had approved and billed to, and/or collected from, its end user customers more than $4 million prior to the effective date of the Settlement Agreement, the Settlement Agreement would have included terms that expressly addressed such additional pre-effective date collections."[119] But today's disappointment in the waterfall's output does not mean that yesterday's negotiations left a gap in the

---

[115] Settlement Agreement § 6.

[116] FAC ¶ 145.

[117] *See* Settlement Agreement §§ 6.1–6.5.

[118] *See, e.g.*, *Lonergan*, 5 A.3d at 1024.

[119] FAC ¶ 144.

42

waterfall provisions that this Court must fill. Such concealment may be addressed by tort, not by rewriting the contract through the implied covenant.[120]

The FAC provides that pre-Effective Date invoices were discussed extensively during negotiations;[121] the parties certainly "thought to negotiate with respect to that matter."[122] It would have been easy for the Settlement Agreement to require Broker to remit collections from all or some of the pre-Effective Date invoices to Servicer and Creditor. Broker also could have committed to a representation about the amount of the pre-Effective Date invoices. Or Servicer and Creditor could have bargained for the Settlement Agreement to expressly require that Broker process and pay on the entire $13 million in Accounts Receivable. Servicer and Creditor failed to secure such terms and now ask this Court to imply those terms for their benefit. But "[r]ather than suggesting a gap that needs to be filled," the Settlement Agreement "reflects a conscious decision" to exclude pre-Effective Date invoices and limit Broker's satisfaction for the disputed $13 million Accounts Receivable to the Escrow Payment and funds collected from post-Effective Date invoices identified in Section 6.[123]

---

[120] Here, as discussed in Section II(D) *infra*, the contract's anti-reliance and integration clauses preclude recovery in tort as well.

[121] *See* FAC ¶¶ 46, 47, 48, 50, 51, 52, 55.

[122] *Lonergan*, 5 A.3d at 1018 (quotation omitted).

[123] *Id.* at 1024; *see* Settlement Agreement §§ 2, 6, 9, 13.

Accordingly, I cannot infer an obligation under the implied covenant to remit funds from pre-Effective Date Billed Invoices.[124] Broker's retention of all funds from those Billed Invoices is "authorized by the terms of the agreement."[125] Count V is dismissed.

## C. The Settlement Agreement Governs The Parties' Relationship, So Plaintiffs' Unjust Enrichment Claim Must Be Dismissed.

Plaintiffs further contend that "[t]o the extent the Court finds that the Settlement Agreement does not cover all [Broker's] collections of the Subject Accounts Receivable (whenever collected), . . . [Broker] was unjustly enrich[ed] by its retention of payments it received from [Broker] Customers on account of services [Servicer] provided."[126] Specifically, Plaintiffs have alleged that they have been impoverished by Broker's retention of pre-Effective Date collections on Billed Invoices in excess of the represented $4 million. Defendants argue that Plaintiffs' unjust enrichment claim must be dismissed because the Settlement Agreement governs the parties' relationship.[127] I agree.

"Unjust enrichment is the 'unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles

---

[124] *See Lonergan*, 5 A.3d at 1024.

[125] *Dunlap*, 878 A.2d at 441.

[126] D.I. 48 at 65.

[127] D.I. 40 at 55.

44

of justice or equity and good conscience.'"[128]  Under Delaware law, the elements of unjust enrichment are (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.[129]  It is "a theory of recovery to remedy the absence of a formal contract."[130]

Thus, "[o]f primary importance to [Plaintiff's] claim for unjust enrichment, however, is not consideration of the elements necessary to prove the claim, but instead the threshold inquiry a court must first engage in:  inquiring whether a contract already governs the relevant relationship between the parties."[131]  If the parties' relationship is comprehensively governed by contract, a claim for unjust enrichment will be dismissed because the "contract is the measure of plaintiffs' right."[132]  Unjust enrichment may be pleaded as an alternative theory of recovery to a breach of contract claim, but the right to do so "does not obviate the obligation to

---

[128] *Doberstein v. G-P Indus., Inc.*, 2015 WL 6606484, at *6 (Del. Ch. Oct. 30, 2015) (quoting *Kuroda*, 971 A.2d at 891–92).

[129] *Nemec*, 991 A.2d at 1130.

[130] *Choupak v. Rivkin*, 2015 WL 1589610, at *20 (Del. Ch. Apr. 6, 2015) (quoting *ID Biomedical Corp. v. TM Techs., Inc.*, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995)).

[131] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009); *accord Metcap Sec. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *5 (Del. Ch. Feb. 27, 2009), *aff'd*, 977 A.2d 899 (Del. 2009) (TABLE).

[132] *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979); *accord Kuroda*, 971 A.2d at 891.

provide factual support for each theory" independently.[133]  To survive a motion to dismiss, the unjust enrichment claim cannot be duplicative of the accompanying breach of contract claim.[134]

Plaintiffs point out that on the one hand, Broker contends the Settlement Agreement governs the parties' entire relationship, while on the other hand, Broker reads the Settlement Agreement to address only post-Effective Date invoices.  According to Plaintiffs, the parties' contract does not contemplate Broker collecting customer payments for Servicer's work without paying Servicer.  And they further assert that, regardless, they have pled unjust enrichment in the alternative.

Here, there is no independent basis for an unjust enrichment claim because Plaintiffs pled no right to recovery not controlled by the Settlement Agreement.[135]  Its terms memorialize the parties' decision as to how Broker would satisfy its obligations with respect to all $13 million of Accounts Receivable.[136]  The Settlement Agreement explicitly recognizes that Broker disputes that it owes Seller

---

[133] *BAE Sys. Info. & Elec. Sys. Integration*, 2009 WL 264088, at *8; *see also Doberstein*, 2015 WL 6606484, at *6; *CMS Inv. Hldgs., LLC v. Castle*, 2015 WL 3894021, at *17 (Del. Ch. June 23, 2015); *Lyons Ins. Agency, Inc. v. Kirtley*, 2019 WL 1244605, at *2 (Del. Super. Ct. Mar. 18, 2019).

[134] *See CMS Inv. Hldgs.*, 2015 WL 3894021, at *17.

[135] *See, e.g., BAE Sys. Info. & Elec. Sys. Integration*, 2009 WL 264088, at *8; *MetCap Secs. LLC*, 2007 WL 1498989, at *5–6.

[136] *See* Settlement Agreement § 9 & RECITAL E.

all $13 million of Accounts Receivable, and the parties negotiated a resolution short of obligating Broker to remit the full $13 million. As discussed at length, the Settlement Agreement plainly excludes the pre-Effective Date Billed Invoices that motivate the unjust enrichment claim. Contrary to Plaintiffs' position, the parties agreed—by limiting Broker's obligations to the Escrow Payment and payment from post-Effective Date invoices specified in Section 6—that Broker could collect payments from its customers from pre-Effective Date invoices and withhold those funds from Servicer and Creditor.

The Settlement Agreement alone dictates the source of funds for Broker's satisfaction of its Accounts Receivable debt. Servicer and Creditor agreed that the terms of the Settlement Agreement provide for full "payment and satisfaction of the Accounts Receivable."[137] In Section 9, Servicer and Creditor agreed that

> [t]he obligations of the [Broker] Parties with respect to the Accounts Receivable shall be governed in all respects by the terms of this Agreement, and the [Broker] Parties' liability with respect to the Accounts Receivable, as settled pursuant to this Agreement, shall be limited to their obligations under the Agreement.[138]

---

[137] *Id.* RECITAL E.

[138] *Id.* § 9.

Plaintiffs "cannot, on these facts, use an unjust enrichment theory to rewrite a comprehensive contract governing the entirety of the parties' relevant relationship after finding disappointment in the resulting agreement."[139]  Count IX is dismissed.

>    **D.    The Settlement Agreement's Anti-Reliance And Integration Provisions Bar Plaintiffs' Claims For Fraudulent Concealment And Misrepresentation.**

In a final effort to recover payment from pre-Effective Date Billed Invoices, Plaintiffs assert claims for misrepresentation and fraudulent concealment.  Both of these claims are premised on allegations that during negotiations, Broker consistently represented that Billed Invoices totaled approximately $4 million of the Accounts Receivable, but after executing the Settlement Agreement, revealed that total to be $6 million.  Plaintiffs also allege that Broker represented that it expected at least another $2 million in Anticipated Collections.  Plaintiffs contend that Broker misrepresented the amount that it would collect on pre-Effective Date Billed Invoices by $2 million, thereby disrupting the balance between pre- and post-Effective Date collections memorialized in the Settlement Agreement.  Plaintiffs allege that Broker's alleged false representations were made "[i]n the [n]egotiations leading up to the Settlement Agreement"[140]—*i.e.*, outside the four corners of the Settlement Agreement.

---

[139] *BAE Sys. Info. & Elec. Sys. Integration*, 2009 WL 264088, at *8.

[140] FAC ¶ 10.

Defendants argue that Plaintiff has failed to plead misrepresentation and fraudulent concealment with particularity as required under Rule 9(b). Further, Defendants contend these claims must be dismissed because the Settlement Agreement expressly disclaims reliance on Broker's extra-contractual representations. I agree.

For purposes of this Motion, I assume that Plaintiffs pled each claim with the requisite particularity under Rule 9(b), but find that the claims still must be dismissed. The Court will dismiss claims for fraud and misrepresentation where plaintiffs' reliance on the defendants' representations was unreasonable.[141] Such reliance is unreasonable where the parties have agreed to explicit anti-reliance language in the terms of the governing agreement.[142] In view of Sections 12 and 13.8 of the Settlement Agreement, a failure of justifiable reliance is fatal to Plaintiffs' fraud and misrepresentation claims, as the alleged misrepresentations occurred outside the four corners of the Settlement Agreement.[143]

In *Progressive International Corporation v. E.I. Du Pont de Nemours & Company*, then-Vice Chancellor Strine stated,

---

[141] *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002).

[142] *Id.*

[143] *Id.*

49

As a general matter, under the objective theory of contracts to which Delaware adheres, it is presumed that the language of a contract governs when no ambiguity exists. Under the objective theory, "'intent' does not invite a tour through [the plaintiff's] cranium, with [the plaintiff] as the guide." This presumption that parties will be bound by the language of the contracts they negotiate holds even greater force when, as here, the parties are sophisticated entities that bargained at arm's length. More specifically, Delaware courts have held that sophisticated parties may not reasonably rely upon representations that are inconsistent with a negotiated contract, when that contract contains a provision explicitly disclaiming reliance upon such outside representations.[144]

Delaware's enforcement of clear anti-reliance provisions is implemented in a long line of cases.[145] "[A] party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim."[146]

"To be effective, a contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four

---

[144] *Id.* (alteration in original) (footnotes omitted) (quoting E. Allan Farnsworth, *Farnsworth on Contracts* § 3.6 (2d ed. 2000)).

[145] *See, e.g.*, *Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35 (Del. Ch. 2015); *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032 (Del. Ch. 2006); *Kronenberg v. Katz*, 872 A.2d 568 (Del. Ch. 2004); *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129 (Del. Ch. 2003); *Progressive Int'l Corp.*, 2002 WL 1558382.

[146] *Abry P'rs*, 891 A.2d at 1057.

corners in deciding to sign the contract."[147]  Such provisions "identify the specific information on which a party has relied and which foreclose reliance on other information."[148]  "Delaware law does not require magic words."[149]

Sections 12 and 13.8 combine to mean Servicer and Creditor did not rely on any information Broker presented outside the four corners of the Settlement Agreement.  Section 12 is clear:

> Each and every one of the parties hereto expressly agrees and acknowledges that it has been represented by counsel in connection with the negotiation and execution of this Agreement.  Each and every one of the parties hereto further expressly agrees and acknowledges that *it is not entering into this Agreement in reliance upon any representations, promises or assurance other than those expressly set forth in this Agreement*.[150]

And Section 13.8 confirms that the Settlement Agreement "supersedes any prior contracts, understandings, discussions, and agreements among the parties."[151]

This language effectively disclaims reliance on Broker's extra-contractual representations regarding those invoices for the Accounts Receivable that it approved and billed to and/or collected from its customers before the Effective Date,

---

[147] *Prairie Capital III*, 132 A.3d at 51 (internal quotation marks omitted) (quoting *Kronenberg*, 872 A.2d at 593).

[148] *Id.* at 50 (citing *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 118–19 (Del. 2012)).

[149] *Id.* at 51.

[150] Settlement Agreement § 12 (emphasis added).

[151] *Id.* § 13.8.

as well as representations regarding what invoices Broker intended to satisfy through the Escrow Payment. Section 12 affirmatively and specifically disclaims reliance.[152] Together with Section 13.8, the provisions "add up to a clear anti-reliance clause."[153] Because Plaintiffs represented that they only relied on the particular information set forth in the Settlement Agreement, "then that statement establishes the universe of information on which that party relied."[154] Plaintiffs' claims cannot rest on extracontractual representations.

Perhaps in view of Servicer and Creditor's express agreement to limit their reliance to the terms set forth in the Settlement Agreement, Plaintiffs also contend that they have alleged fraud and misrepresentation within the Settlement Agreement itself, so Sections 12 and 13.8 cannot bar their claims. Plaintiffs allege Broker represented the pre-Effective Date Billed Invoices amounted only to approximately $4 million. Plaintiffs contend this representation is baked into the Settlement Agreement in a nuanced way: (1) the Settlement Agreement was intended to ensure payment on all of the approximately $13 million of Accounts Receivable; and (2) the $6 million Escrow Payment was intended to address all pre-Effective Date Billed Invoices (approximately $4 million), plus a $2 million "prepayment" of Anticipated

---

[152] *See Prairie Capital III*, 132 A.3d at 51.

[153] *Kronenberg*, 872 A.2d at 593.

[154] *Prairie Capital III*, 132 A.3d at 51.

Collections. Plaintiffs conclude that "[Broker] represented, in the Settlement Agreement itself, that the $6 million [] Escrow Payment included the $2 Million Prepayment (along with the $4 Million Payment)," meaning $4 million in pre-Effective Date Billed Invoices.[155]

The Settlement Agreement contains no representations regarding the amount of pre-Effective Date Billed Invoices. Section 6.2.2's mention of "prepaid" Accounts Receivable does not reference or quantify Billed Invoices. Section 6.6.2 provides a parenthetical reaffirmation that, as part of the parties' compromise, Broker prepaid Servicer the first $2,000,000 of Future Customer Collections out of escrow, and therefore gets to keep those funds when they come in. By definition, those funds are post-Effective Date. They do not correspond to pre-Effective Date Billed Invoices.

Plaintiffs point out that the $6 million Escrow Payment minus the $2 million of prepaid Future Customer Collections equals $4 million, and conclude those $4 million represent pre-Effective Date Billed Invoices as disclosed during negotiations. While Plaintiffs have found a mathematical equation in the Settlement Agreement that reduces to $4 million, the Agreement makes no representation linking that quantity to pre-Effective Date Billed Invoices. Plaintiffs have failed to

---

[155] D.I. 48 at 49.

identify a misrepresentation within the four corners of the Settlement Agreement that can support their claims for fraud in view of the anti-reliance language.[156]

Finally, Plaintiffs argue that Sections 12 and 13.8 do not bar their claims because those provisions do not explicitly disclaim reliance on extra-contractual "omissions."[157] They contend that "[Broker] deliberately concealed that it had billed and/or collected more than $4 million of the Subject Accounts Receivable prior to the Effective Date and failed to provide relevant information related to its pre-Effective Date billings and collections," and that "Section 12 of the Settlement Agreement does not state that Plaintiffs disclaimed reliance on any information that [Broker] concealed or make any statement regarding the accuracy or completeness of the information [Broker] provided."[158]

Plaintiffs rely on *Transdigm Inc. v. Alcoa Global Fasteners, Inc.*, in which the Court allowed a fraud claim based on an alleged omission or withholding of

---

[156] Because the misrepresentations are not within the Agreement, and do not relate directly to any specific provisions, Plaintiffs' reliance on *Overdrive, Inc. v. Baker & Taylor, Inc.*, 2011 WL 2448209, at *6 (Del. Ch. June 17, 2011), is misplaced. In *Overdrive*, invoking *Abry Partners*, this Court declined to enforce an otherwise clear anti-reliance provision where the alleged material misrepresentations and omissions "*in the Agreement*—if proven to be true—frustrate the very purpose and nature of the Agreement." *Id.* (emphasis added) (citing *Abry P'rs*, 891 A.2d at 1062). The Court noted that the representations and omissions "relate directly to" specific provisions, "and, indeed, go to the very core of the Agreement." *Id.* Here, the alleged misrepresentations are not "in the Agreement." Nor are they at its core: as discussed, the Agreement simply does not address pre-Effective Date Billed Invoices.

[157] D.I. 48 at 52–54.

[158] *Id.* at 53–54.

information to proceed where the seller did not make a representation regarding the "accuracy and completeness" of the seller's information, "[n]or did buyer disclaim reliance on extra contractual omissions."[159] In *Prairie Capital III, L.P. v. Double E Holding Corporation*, Vice Chancellor Laster recently declined to apply *Transdigm*, to hold that an anti-reliance provision must explicitly disclaim omissions to have a "representation-defining effect."[160] Defendants assert that *Prairie Capital* is controlling here, and I agree.

"Delaware law permits contracting parties to define in an agreement those representations of fact that formed the reality upon which the parties premised their decision to bargain. The critical distinction is not between misrepresentations and omissions, but between information identified in the written agreement and information outside of it."[161] In support, the Court turns to the "powerful practical rationale" that "'[e]very misrepresentation, to some extent, involves an omission of the truth . . . .' Consequently, any misrepresentation can be re-framed for pleading purposes as an omission."[162]

---

[159] 2013 WL 2326881, at *6 (Del. Ch. May 29, 2013).

[160] 132 A.3d at 34.

[161] *Id.* at 52 (citation and internal quotation marks omitted) (quoting *Abry P'rs*, 891 A.2d at 1058).

[162] *Id.* at 52–53 (citation omitted) (quoting *Universal Am. Corp. v. P'rs Healthcare Sols. Hldgs., L.P.*, 61 F. Supp. 3d 391, 400 (D. Del. 2014)).

I am persuaded by the reasoning in *Prairie Capital* and conclude that the Settlement Agreement bars Plaintiffs' fraudulent concealment and misrepresentation claims, even if those claims are based on Broker's alleged omissions.

> Recasting an allegation as an omission should not enable a party to circumvent an agreed-upon informational definition. Representation-limiting language defines the universe of information on which the contracting party relied. If the contract says that the [Plaintiffs] only relied on the representations in the four corners of the agreement, then that is sufficient.[163]

Plaintiffs "cannot escape through a wormhole into an alternative universe of extra-contractual omissions" simply because they are now disappointed with the results under the Settlement Agreement.[164]

I accept as true Plaintiff's allegations that Broker made certain representations while negotiating the Settlement Agreement that were later determined to be false or misleading. But to the extent that Servicer and Creditor relied on Broker's representations regarding (1) invoices it approved and billed to and/or collected from customers before the Effective Date, (2) the significance of any "prepayment," and (3) the assumption that Broker would pay all invoices for the $13 million of Accounts Receivable, if representations "were important or even fundamental to its

---

[163] *Id*. at 54–55.

[164] *Id.* at 53.

decision to contract, [Plaintiffs] could have negotiated to have those representations reduced to writing and included in the Agreement."[165]

In sum, despite the fact that the parties extensively negotiated and exchanged drafts for weeks, Servicer and Creditor failed to secure contractual protections for the shortcomings they now face. They did not bargain for a single representation, warranty, or recital to evidence their understanding that Broker had only approved and billed to and/or collected only $4 million of the Accounts Receivable prior to the Effective Date. Nor did they bargain for express language and terms that would support their claim that all $13 million in Accounts Receivable would be paid under the Settlement Agreement, rather than terms that satisfied Broker's obligations with a subset of the Accounts Receivable's invoices. By their own binding contractual representation, Plaintiffs precluded their ability to reasonably rely on any oral statements, or omissions, by Broker that were not reduced to writing in the Settlement Agreement. In view of Sections 12 and 13.8, Counts VI and VII are dismissed.

**E.** **Plaintiffs Have Also Failed To State A Claim For Mistake And Reformation.**

Plaintiffs' mistake claim is largely premised on the same allegations underlying their fraudulent concealment and misrepresentation claims. In particular,

---

[165] *Progressive Int'l Corp.*, 2002 WL 1558382, at *8.

Plaintiffs contend that the Escrow Payment was structured on $4 million of pre-Effective Date Billed Invoices, plus $2 million prepayment for the remaining Accounts Receivable. Because the Settlement Agreement does not memorialize this understanding, Plaintiffs contend that the Settlement Agreement should be reformed due to unilateral—or in the alternative, mutual—mistake.

The Court may reform a contract "only when the contract does not represent the parties' intent because of fraud, mutual mistake or, in exceptional cases, a unilateral mistake coupled with the other parties' knowing silence."[166] "[A] party seeking reformation by definition admits that had he read the document more carefully, he would have noticed and corrected the mistake."[167] But although a plaintiff does not waive a claim for mistake simply by signing the agreement, its claim will fail where the allegations make it clear that the plaintiff had reason to know of the mistake in the agreement.[168]

The mistake doctrine disregards the parties' agreed-upon contractual framework. "One claiming mistake assumes that the contract is clear on its face. The claimant must argue that, notwithstanding this clarity, the court should enforce

---

[166] *Great-W. Inv'rs LP v. Thomas H. Lee Pr's, L.P.*, 2011 WL 284992, at *11 (Del. Ch. Jan. 14, 2011) (quoting *James River-Pennington Inc. v. CRSS Capital, Inc.*, 1995 WL 106554, at *7 (Del. Ch. Mar. 6, 1995)).

[167] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 681 (Del. 2013).

[168] *See Great-W. Inv'rs LP*, 2011 WL 284992, at *12.

another meaning of the contract. The argument is that the contract's 'clear meaning' is not *really* the meaning the parties intended."[169] Accordingly, this Court has stated that this doctrine "must be applied narrowly so as to ensure to contracting parties that in only limited circumstances will the court look beyond the four corners of a negotiated contract."[170] This is especially true here, where the Settlement Agreement contains an unambiguous integration provision.[171]

While mutual and unilateral mistake are separate claims, they are closely related. A substantive element of both unilateral and mutual mistake is that "the parties came to a specific prior understanding that differed materially from the written agreement."[172] The Supreme Court, in *Cerberus International, Ltd. v. Apollo Management, L.P.,* highlighted this requirement:

> There are two doctrines that allow reformation. The first is the doctrine of mutual mistake. In such a case, the plaintiff must show that both parties were mistaken as to a material portion of the written agreement. The second is the doctrine of unilateral mistake. The party asserting this doctrine must show that it was mistaken and that the other party knew of the mistake but remained silent. Regardless of which doctrine is used, the plaintiff must show by clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement.[173]

---

[169] *Interactive Corp. v. Vivendi Universal, S.A.*, 2004 WL 1572932, at *15 (Del. Ch. June 30, 2004) (emphasis in original).

[170] *Id.*

[171] *Id.*

[172] *Id.*

[173] 794 A.2d 1141, 1151–52 (Del. 2002) (footnotes omitted).

For purposes of this Motion, I assume that Plaintiff has pled both mutual and unilateral mistake with the requisite particularity under Rule 9(b), but find that the claim must be dismissed. A claim for reformation based on a mutual mistake will survive a motion to dismiss under Court of Chancery Rule 12(b)(6) only if it alleges: (1) that the parties reached a definite agreement before executing the final contract; (2) that the final contract failed to incorporate the terms of the agreement; (3) that the parties' mutually mistaken belief reflected the true parties' true agreement; and (4) the precise mistake the parties made.[174] Furthermore, "such mistake must be as to a fact which enters into, and forms the very basis of, the contract; it must be of the essence of the agreement, the *sine qua non* or, as it is sometimes expressed, the efficient cause of the agreement."[175]

The theories of misrepresentation and mutual mistake of fact "involve overlapping inquiries."[176] Therefore, a failure of justifiable reliance is fatal to a claim for mutual mistake.[177] This Court has determined that a plaintiff's reliance is unreasonable such that it justifies dismissal of a mutual mistake claim where, as here,

---

[174] *Great-W. Inv'rs LP*, 2011 WL 284992, at *11.

[175] *Liberto v. Bensinger*, 1999 WL 1313662, at *12 (Del. Ch. Dec. 28, 1999).

[176] *Id*. at *14; *see also Progressive Int'l Corp.*, 2002 WL 1558382, at *7.

[177] *Progressive Int'l Corp.*, 2002 WL 1558382, at *7; *accord Liberto*, 1999 WL 1313662, at *14 ("I believe that, just as the Libertos' innocent misrepresentation claim has failed in part due to unjustifiable reliance, their mutual mistake argument is also flawed because it was they who assumed the risk of the mistake.").

60

the parties' agreement contains clear anti-reliance and integration provisions.[178] Therefore, as explained, Plaintiffs' claim for mutual mistake must be dismissed in view of Sections 12 and 13.8.

As to unilateral mistake, Plaintiffs "must show that the parties had come to a definite agreement that differed materially from the written agreement,"[179] and that "that despite the existing written agreement one party maintains is accurate, that existing writing erroneously expresses the parties' true agreement."[180] However, a claim for unilateral mistake will be dismissed where the plaintiff had reason to know of the mistake in the agreement.[181]

Plaintiffs' unilateral mistake theory repackages their misrepresentation theory. Plaintiffs contend that as a consequence of Broker's misrepresentation, Plaintiffs were mistaken as to amounts Broker collected prior to the Effective Date, and that Broker knew of Plaintiffs' mistake and took advantage of it by remaining silent.[182] Plaintiffs' claim for unilateral mistake implicitly requires that Plaintiffs rely on the representations beyond the agreement, as well as on Broker's knowing silence. Plaintiffs' mistake was not of their own making: it is based on what Broker

---

[178] *See Progressive Int'l Corp.*, 2002 WL 1558382, at *7.

[179] *Great-W. Inv'rs LP*, 2011 WL 284992, at *11.

[180] *Scion Breckenridge*, 68 A.3d at 680.

[181] *See Great-W. Inv'rs LP*, 2011 WL 284992, at *12.

[182] *See* FAC ¶¶ 170–77.

told them.  Having already concluded that the Settlement Agreement forecloses Plaintiffs from relying on Broker's extracontractual representations and omissions, I find that Plaintiffs' unilateral mistake claim must be dismissed.

**F.     The Cooperation Claims Survive Defendants' Motion.**

Finally, Plaintiffs contend that Defendants have breached Section 6.7 of the Settlement Agreement and seek specific performance of the same.  According to Plaintiffs, in the months after executing the Settlement, Broker repeatedly rejected Plaintiffs' efforts to cooperate in order to verify and reconcile payments and other matters under Section 6.6.  Plaintiffs allege that they repeatedly asked Broker for information necessary to meaningfully verify and reconcile payments they were receiving under Section 6.6, considering that Broker was and remains in sole possession of that information.  In opposition, Defendants contend that they have no obligation to cooperate by providing the information Plaintiffs request because Section 6.7 does not create an information access right.

Defendants' argument fails under the plain language of Section 6.7, when read in view of the entire Settlement Agreement.  Section 6.7 is unambiguous.  That provision applies to both Broker and Servicer (not Creditor), and requires that they "cooperate with one another regarding a process for the parties to verify and reconcile with respect to the [Future Customer Collections], payments, and other

matters addressed in this Section 6."[183]  In plainer words, it requires them "to act or work with another" to verify and reconcile the matters addressed in Section 6.[184]

Broker argues its alleged failure to provide Servicer with information that is allegedly "necessary," "sufficient," "basic," and "essential" to conduct a "meaningful verification and reconciliation" of "matters addressed in Section 6" is excused because Section 6.7 does not create an information access right.[185]  Broker reads Section 6.7 too austerely.  The plain terms of Section 6.7 do not require the parties to exchange information.  But a comprehensive reading of the Settlement Agreement and Section 6.7 confirms that the obligation to "cooperate" with Servicer regarding a process to verify and reconcile payments necessarily includes an exchange of information.[186]

---

[183] Settlement Agreement § 6.7.

[184]  *Cooperate*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/cooperate (last visited April 29, 2020) ("1: to act or work with another or others  : act together or in compliance  2 : to associate with another or others for mutual benefit").

[185] D.I. 52 at 11–12.

[186] Defendants concede that information exchange is encompassed in the mandate to "cooperate."  Pointing to Plaintiffs' Third Amended Complaint, Defendants argue Plaintiffs' claim should fail because, at one time, they alleged that Defendants "*did* cooperate."  *Id.* at 15.  They rely on Plaintiffs' former allegation that "[d]uring the first several months following execution of the Settlement Agreement, [Broker] personnel worked with [Servicer] representatives *in an effort to provide accounting information* regarding all of the Subject Accounts Receivable . . . ."  *Id.* (alteration in original) (quoting Third Am. Compl. ¶ 79).

Cooperation under Section 6.7 is in aid of verification and reconciliation. To "verify" means to "to establish the truth, accuracy, or reality of," and is synonymous with "confirm," "corroborate," "substantiate," and "validate."[187] According to Merriam-Webster, "verify implies the establishing of correspondence of actual facts or details with those proposed or guessed at."[188] To "verify" necessarily implicates the exchange of information.[189] To "reconcile" means "to make consistent, "to check (a financial account) against another for accuracy," or "to account for."[190] Plainly, reconciliation with regard to the Future Customer Collections requires Broker to give Servicer information against which to check Servicer's accuracy.

And Section 13.7 requires that the parties "do all such acts and cause to be done all such things as the other parties reasonably may request in order to give full effect to this Agreement."[191] Reading Sections 6.7 and 13.7 together, Servicer is entitled to reasonably request that Broker provide information against which Servicer can "verify" and "reconcile" the Future Customer Collections. Considering

---

[187] *Verify*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/verify#synonyms (last visited April 29, 2020).

[188] *Id.*

[189] *See id.*

[190] *Reconcile*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/reconcile (last visited April 29, 2020).

[191] Settlement Agreement § 13.7.

that Broker is in sole possession of all information regarding the Future Customer Collections and that Servicer can obtain such information from no other source, Servicer is unable to "verify" and "reconcile" payments under Section 6 if Broker effectively withholds all pertinent information.

Under any reasonable interpretation of Section 6.7, Broker must provide to Servicer the basic information Broker alone holds to allow any meaningful verification and reconciliation. Servicer cannot verify and reconcile payments against a blank set. If cooperation under Section 3.7 did not encompass the exchange of information between the parties, then the term would be rendered meaningless.

Broker also contends that while it did cooperate with Plaintiffs in the early days after the Settlement Agreement, it has satisfied its obligations and need not do more. Plaintiffs have alleged that Broker regularly communicated with Servicer regarding processing the Accounts Receivable and allocating collections under the Settlement Agreement for several months after the Effective Date. But as time passed, Broker refused to meaningfully communicate with Servicer and became unresponsive. According to Defendants, Broker's early cooperation is "all that is required by Section 6.7."[192]

Section 6.7 does not limit the duration of Broker's obligation, which logically continues until all Future Customer Collections have been processed, verified, and

_____

[192] D.I. 52 at 15.

reconciled under Section 6. When Broker went silent, the parties had not completed processing, verifying, or reconciling the Future Customer Collections. The Agreement does not permit Broker to stop "act[ing] or work[ing] with" Servicer regarding a process for verifying and reconciling payments under Section 6 until the payments have been made. Broker's argument fails.

Plaintiffs have alleged that Defendants ceased meaningful communications regarding payments under Section 6 and that they have refused to provide reasonably requested information necessary to verify and reconcile the payments. At the pleading stage, this is sufficient. But it remains to be seen what type of information and how much must to be exchanged to satisfy the obligation to "cooperate" under the Settlement Agreement. The specific contours of the required cooperation will be developed through discovery. Count II survives the Motion.

And in light of Section 6.7, Plaintiffs have alleged facts sufficient to support a claim for specific performance. A party seeking specific performance must allege that (1) a valid contract exists, (2) the party is ready, willing, and able to perform under the contract, and (3) the balance of equities favors the party seeking performance.[193] The party must also allege the absence of any adequate legal remedy.[194]

---

[193] *Osborn ex rel. Obsorn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).
[194] *Id.*

The Settlement Agreement is a valid contract. Broker is able to communicate meaningfully and work with Servicer toward establishing a process for verification and reconciliation, and Broker is in possession of all information regarding the Future Customer Collections, which it can share with Servicer to reconcile and verify under Section 6.7. While Broker questions its ability to perform under a nebulous cooperation requirement, at this stage, I conclude that Broker is able to participate in at least a minimal information exchange. As stated, the scope of that performance will be developed through discovery.

And because Broker is in sole possession of this information, the balance of the equities favors Servicer. Finally, Plaintiffs have also alleged that they have no remedy available at law. They cannot determine the extent to which Broker failed to comply with the terms of the Settlement Agreement regarding the processing, collection, allocation, and remittance of the Accounts Receivable and related collections, or the full extent of Plaintiff's money damages, without Broker's compliance with the verification and reconciliation process required under Section 6.7. Plaintiffs have stated a claim for specific performance of Section 6.7 under Count III.

## III. CONCLUSION

For the foregoing reasons, the Motion is DENIED in part and GRANTED in part. The Motion is denied as to the Post-Effective Date Claim set forth in Count

IV, as well as the Cooperation Claims set forth in Counts II and III.  The Motion is granted as to the Pre-Effective Claims set forth in Counts I, V, VI, VII, VIII, and IX. The parties shall submit an order implementing this decision within twenty days.